Filed 6/11/21  Daniel J. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DANIEL J., | F082479 |
| Petitioner, | |
| v. | (Super. Ct. No. JVDP-19-000320) |
| THE SUPERIOR COURT OF STANISLAUS COUNTY, | **OPINION** |
| Respondent; | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, | |
| Real Party in Interest. | |

## THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Ann Q. Ameral, Judge.

Mussman & Mussman and William E. Mussman III for Petitioner.

No appearance for Respondent.

Thomas E. Boze, County Counsel, and Lindy GiacopuzziRotz, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]      Before Detjen, Acting P.J., Peña, J. and DeSantos, J.

Petitioner Daniel J. (father) seeks extraordinary writ relief from the juvenile court's orders issued at a contested 12-month review hearing (Welf. & Inst. Code, § 366.21, subd. (f))[1] terminating reunification services and setting a section 366.26 hearing for June 29, 2021, as to his now 18-month-old son, Daniel J., Jr. (Daniel). Father contends the juvenile court erred in finding it would be detrimental to return Daniel to his custody. Alternatively, he contends the court erred in finding there was not a substantial probability Daniel could be returned to his custody with continued services. We deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

Newborn Daniel was placed on a protective hold at the hospital by the Stanislaus County Community Services Agency (agency) in December 2019 after he and his mother, Monica S. (mother),[2] tested positive for methamphetamine. Mother said she and father lived in a " 'drug house' " and that he was a drug user also. She disclosed having bipolar disorder. Father denied using drugs but appeared to be under the influence. Hospital staff stated father's speech was rapid. He said he had a room prepared for the baby, but the "rest of the house was packed full of things that he had hoarded."

The agency filed a dependency petition, alleging Daniel came within the juvenile court's dependency jurisdiction under section 300, subdivision (b) (failure to protect). The court ordered Daniel detained and offered the parents services pending its disposition of the case. The agency placed Daniel in foster care. Daniel had a sibling who also tested positive for methamphetamine at birth in 2016 and was placed with a family friend under a legal guardianship after mother failed to reunify.

The juvenile court exercised its dependency jurisdiction over Daniel at the dispositional hearing in March 2020. Father was making good progress in his services.

---

[1]     Statutory references are to the Welfare and Institutions Code.

[2]     Mother did not file a writ petition.

2

He completed a substance abuse assessment and tested negative for drugs. He was not recommended for treatment. He visited Daniel regularly, however, the visitation center staff believed his parenting skills needed improvement. Mother was incarcerated in January 2020 and released in March 2020. The juvenile court ordered the parents to participate in reunification services and set the six-month review hearing in September 2020. Father's services plan required him to complete a parenting program, individual counseling and a substance abuse assessment and follow any recommendations.

Father continued to engage in reunification services and visitation. By the six-month review hearing, he completed a parenting class. Mother, however, was not participating in services and only visited Daniel when she was at father's house. Meanwhile, Daniel was bonding with his foster parents and the other children in the home. He was diagnosed with asthma/reactive airway disease, which increased his risk of suffering serious complications if exposed to the COVID-19 virus. As a result, he was unable to visit his parents in person but rather through video calls. The agency recommended the juvenile court continue services for father at the six-month review hearing but terminate mother's services.

The juvenile court adopted the agency's recommendations, terminated mother's reunification services at the six-month review hearing in September 2020 and continued father's services to the 12-month review hearing scheduled for January 2021.

In its report for the 12-month review hearing, the agency recommended the juvenile court terminate father's reunification services and set a section 366.26 hearing. Father was no longer actively participating in his services plan; he stopped attending counseling sessions in November 2020. He tested negative for drugs in December 2020 but, according to the agency, "the line was very faint under methamphetamine." He continued to associate with mother even though she continued to use drugs and he was ill prepared for visits.

3

In addition, father's home was not safe for Daniel and he was not taking measures to improve the conditions. He kept everything he had as a child and everything his children acquired since they were babies because he could not bring himself to discard them. Initially, he would not allow the social worker to see inside his home but eventually allowed her access. The wall in the entryway was piled nearly to the ceiling with clothing and other items. The living room was so full of items that the floor was not visible, and the room was not accessible. There were at least a dozen small dogs in the home who ran around and bit the social worker's boots as she walked through the home. The hallway was cluttered with bicycles, clothing and other debris. Father's room was full and cluttered with items and dog feces. A mattress was propped up against the wall and five small puppies exited a hole in the mattress. There was a clean bathroom in the hallway. The kitchen counters were piled high with items and there was only a small walkway through the kitchen. The sink was full of dishes. Bicycles, bicycle parts and dog feces covered the family room floor. The backyard was also cluttered with various items, including several washers and dryers. There were several items piled onto the front porch. The social worker told father he would have to clean his home before Daniel would be returned to his custody. The agency attached pictures of the home to its report.

The 12-month review hearing was continued until March 1, 2021. Meanwhile, the agency filed an addendum report, still recommending termination of services. A social worker visited father at his home on February 16, 2021, and the condition of the home appeared worse. There were still piles of clothes and clutter blocking the rooms and although the puppies were gone, there were several small dogs, there was smeared animal feces throughout the home and the odor was extremely bad. The social worker took pictures of the home, which were attached to the report. Mother was present and father appeared defensive. He said she had just gotten out of jail. Father resumed counseling on February 8, 2021, but according to his counselor did not understand why the condition of his home concerned the agency and that there may be possible hazards that would

4

injure Daniel. She stated, "[father] continues to report the same things he reported when he began services and appears to have little insight on concerns regarding his child's safety."

The contested 12-month review hearing was conducted on March 1, 2021. Richard Brown testified he met father three years before at a yard sale. He had a vacant room that father could rent and stay as long as he wanted. Father agreed to rent the room but had not entered into a lease agreement or paid him any rent. Brown believed his house was safe for Daniel and he did not object to the agency inspecting his home.

Father's adult daughter, Danielle, testified father was always there for her and she had a "great childhood." She never saw him use illegal drugs. She lived in his home approximately a year before but also stayed with her significant other. She witnessed the clutter in his home, and it was something she and father were working on. The condition of the home was not as bad when she lived there. He occasionally asked her to help him work on the house and she found him to be more motivated to do that in the previous several months. They were able to eliminate an "enormous amount" of clutter by getting a trailer, approximately 15 feet in length, which they filled up three to four times a week and took the contents to the dump.

Father testified he was a good father and could keep Daniel safe. He rented the home he lived in. He acknowledged that the pictures attached to the addendum report accurately reflected the condition of the home on the date they were taken. The social worker never told him the clutter in his home was the reason he could not reunify with Daniel. She just told him he needed to remove it. His daughter's estimate of the progress they had made was accurate; they had gotten rid of clutter since the pictures were taken. If the court were to place Daniel in his custody, he would take him to Brown's home. Brown's home was immaculate. Mother occasionally visited him but did not live with him. When she visited, she stayed for "hours" but left when he asked her to leave. He could enforce no-contact between Daniel and mother if the court placed Daniel in his

5

custody. He visited Daniel once a week by video call. They had not had any in-person visits in the prior six months. Daniel recognized him immediately and smiled. Daniel was happy to see him. He had only to finish his parent/child labs to complete his services plan. The pandemic and the restrictions imposed prevented him from completing the parent/child labs.

In response to questions by the juvenile court, father acknowledged he discontinued individual counseling after mid-November 2020 because his phone was stolen, and he was unable to attend. He since obtained another phone. He rarely saw mother and they had not been in a romantic relationship for six months.

On cross-examination, father denied that he ever posed a safety risk to Daniel but had come to realize that the condition of his home did. He wanted to rent from Brown because he did not have time to clean his home fast enough to bring Daniel home. Cleaning his home was "overwhelming" because it contained 30 years' worth of his belongings. He planned to empty it out, sanitize and clean it, just keep necessities and re-carpet the whole house. He guaranteed he would keep his home clean. He planned to keep both residences, which he could afford. He would not permit mother to have contact with Daniel and if she persisted, he would get a restraining order.

Social worker Kristina Lynn testified the agency's recommendation to terminate father's reunification services was unchanged by his decision to rent new housing. The agency remained concerned about his ability to make good decisions and keep a new residence clean given the condition of his home and inability to clean it over the prior year. The agency was also concerned about his ability to separate from mother. He told Lynn many times that he loved mother and had a hard time letting her go. Lynn did not share father's positive impression of his visits with Daniel. He did not engage Daniel very often and instead just sat there "looking."

County counsel argued there was a substantial risk to Daniel if returned to father's custody and there was not a substantial probability Daniel could be returned to his

6

custody by June 4, 2021, which marked 18 months from the date he was taken into protective custody. Minor's counsel concurred, adding that renting another room was not a realistic long-term plan. Father's attorney pointed out that father's efforts in complying with his case plan were "stellar" and that the only barriers to reunifying with Daniel were the condition of his home and codependent relationship with mother. He took steps to keep Daniel safe by securing a new place to live. If allowed to continue with services, father could address his hoarding in counseling. He also resolved the codependency issue by his commitment not to let mother visit or by obtaining a restraining order. Father's attorney argued the court should return Daniel to father's custody outright or with family maintenance services or continue reunification services for him.

The juvenile court found there would be a substantial risk of detriment to Daniel if he were returned to father's custody. The court was concerned that the condition of father's home had not been resolved despite ample time to address it. The court questioned the legitimacy of his argument on the eve of trial that he intended to rent a room. He had not in fact rented a room or even made arrangements to do so. A lease or rental agreement was not in place and the court had no guarantee that it was going to happen. The condition of father's home was also a concern. The prospect that father would return there with Daniel given the dogs and feces in addition to the overwhelming clutter was untenable.

The juvenile court also found there was not a substantial probability Daniel could be returned to father's custody in the three months remaining before the 18-month review hearing. Although it found father regularly and consistently visited Daniel, it could not find father made significant progress in resolving the problems that required Daniel's removal. The court pointed to father's failure to provide a safe home for Daniel, address his codependent relationship with mother and complete individual counseling. The court did not consider his inability to complete the parent/child labs given the likelihood Daniel's compromised immunity prevented him from completing them. Having found

7

father was provided reasonable reunification services and there was not a substantial probability of return, the court terminated father's reunification services and set a section 366.26 hearing.

## DISCUSSION

Father contends he resolved the major threat to Daniel's safety, which was the condition of the home. Therefore, Daniel should have been returned to his custody. He further contends there was a substantial probability Daniel could have been returned to his custody by the 18-month review hearing and therefore the court erred in terminating services. Finally, he contends COVID-19 presented extraordinary circumstances and constituted good cause to continue services. We find father's claims meritless.

*Legal Principles*

Until reunification services are terminated, there is a statutory presumption that a dependent child will be returned to parental custody. (*In re Marilyn H*. (1993) 5 Cal.4th 295, 308.) Section 366.21, subdivision (f), which governs the 12-month review hearing, requires the juvenile court to return the child to the custody of the parent unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being. (§ 366.21, subd. (f)(1).) The agency has the burden of proving detriment. (*Ibid*.)

If the juvenile court does not return the child, it may continue the case for up to six months if there is a substantial probability the child will be returned to parental custody within 18 months from the time the child was initially removed. (§ 366.21, subd. (g)(1).) To find a substantial probability of return, the court must find the parent regularly visited the child, made significant progress in resolving the problem prompting the child's removal, and demonstrated the capacity and ability to complete the objectives of the case plan and provide for the child's safety, protection, and well-being. (§ 366.21, subd. (g)(1)(A)–(C).) Otherwise, the court must terminate reunification services and set a section 366.26 hearing to implement a permanent plan for the child. (§ 366.21,

8

subd. (g)(4).)  Before the court may terminate services and set a section 366.26 hearing, however, there must be clear and convincing evidence the agency provided reasonable services to the parent.  (§§ 361.5, subd. (a), 366.21, subd. (g)(4).)

We review the juvenile court's findings and orders for substantial evidence.  (*In re Brison C*. (2000) 81 Cal.App.4th 1373, 1378–1379.)  In so doing, "we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders.  [Citation.]  'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' "  (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)  We conclude substantial evidence supports the juvenile court's decisions not to return Daniel to father's custody and to terminate his reunification services.

*Detrimental Return*

Father does not dispute that the condition of his home "which is filled with debris" poses a risk of harm to Daniel.  Rather, he contends he resolved the problem by locating an alternative residence where he could live with Daniel.

The problem, as the juvenile court saw it, was that father had not actually secured the room in Brown's house by executing a formal agreement.  Consequently, the court could not be sure that father would actually move into Brown's home.  Further, there was no guarantee that father would not return to his own home in its current state with Daniel and continue his pattern.  Although there is no evidence in the record father was diagnosed with hoarding, the court and the parties refer to his behavior as hoarding and father's own testimony supports such an inference.  He testified his desire to keep his belongings was overwhelming, and he had a hard time parting with them.  Assuming he is a hoarder, the chances of him continuing his behavior and jeopardizing Daniel's safety was likely without mental health counseling, which he had not completed.

9

Father contends his circumstances mirror those of the mother in *In re Kimberly F.* (1997) 56 Cal.App.4th 519 (*Kimberly F.*), a dirty house case in which the appellate court concluded the juvenile court erred in finding detrimental return and ordered the court to return the children to parental custody. (*Id*. at pp. 497, 535) *Kimberly F.*, however, is distinguishable on several key points.

The mother in *Kimberly F.* lost custody of two of her children because her home was dirty and unsanitary in the "extreme." (*Kimberly F.*, *supra*, 56 Cal.App.4th at pp. 521–522, 524.) By the 18-month review hearing, the condition of the home had improved. However, the juvenile court found that return of the children would be detrimental based on the condition of the home and a psychologist's opinion that mother had a narcissistic personality disorder. (*Id*. at pp. 497–498.) The court terminated reunification services and set a section 366.26 hearing. The mother filed a writ of mandate, challenging the termination order, arguing in part there was insufficient evidence to support the detriment finding. The court of appeal affirmed the order. (*Id*. at p. 498.) The mother subsequently filed a modification petition (§ 388), in which she averred that her house remained clean and safe since the 18-month review hearing and a psychologist opined that she did not exhibit any " 'psychopathology.' " A hearing on the section 388 petition was conducted in conjunction with the section 366.26 hearing. The juvenile court denied the mother's section 388 petition and proceeded to the section 366.26 hearing. The testimony was undisputed that the mother maintained a very close bond with her children. The court terminated the mother's parental rights. She appealed both the order denying her section 388 petition and the order terminating her parental rights. (*Id*. at pp. 525–526.)

The appellate court concluded the juvenile court abused its discretion in denying the mother's section 388 petition because the problem had been removed; "the worst the social worker could do was to point to some clutter and extension cords." It further stated a dirty house is not an intractable problem and where "the reason for poor

10

housekeeping is supposedly some vague characterization about a 'generally conservative' and 'narcissistic' personality, there is really nothing *but* poor housekeeping to be held against the parent." The court also noted the bond between the mother and children was undisputedly strong. (*Kimberly F.*, *supra*, 56 Cal.App.4th at pp. 532, 535.)

Here, the problem necessitating Daniel's out-of-home placement was more than a "dirty house" situation and it was *not* resolved. Nor was there any prospect that it would be in the foreseeable future. Further, the underlying cause—i.e., hoarding—is more than an "unflattering label[]" describing father's personality (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532), it is a disorder with distinctive features. When a " 'dirty house' " case involves a mental illness, the appellate court stated, the "case will tend to move away from the parent's side of the continuum." (*Kimberly F.*, at p. 532.)

We conclude substantial evidence supports the juvenile court's detriment finding.

*Substantial Probability of Return*

We further conclude substantial evidence supports the juvenile court's finding there was not a substantial probability Daniel could be returned to father's custody in the three months remaining before the 18-month review. Although it is undisputed father regularly visited Daniel, he did not make significant progress in resolving his hoarding behavior and demonstrating the capacity and ability to provide a safe home for Daniel. Father claims that he did, pointing to the significant amount of debris he removed from his home and his location of an alternate residence. The reality was, despite father's efforts, his home remained uninhabitable for Daniel. Further, the fact that he delayed until just several months before the hearing casts doubt on the sincerity of his efforts to improve his home environment. More telling still, he lacked insight into how his hoarding played a role in Daniel's removal.

To the extent father contends the restrictions imposed as a result of the COVID-19 virus prevented him from sufficiently progressing to warrant a continuation in services, the record does not support his claims. He claims, for example, he could not hire a

11

"crew" to help him clean his home. However, he did not present evidence that he attempted to hire a crew. He also claims he participated in individual counseling remotely using his phone. However, his phone was stolen before Christmas 2020, causing him to miss three weeks of counseling before he was able to buy a new phone. He testified the lack of a phone was the only reason he did not participate in counseling. Had he been able to attend in person, he would have. However, according to the record, he did not resume counseling until early February 2021, yet he provides no reason why COVID-19 prevented him from attending counseling sessions in the meantime.

We find no error.

## DISPOSITION

The petition for extraordinary writ is denied. This court's opinion is final forthwith as to this court pursuant to California Rules of Court, rule 8.490(b)(2)(A).